Good morning, your honors. My name is Ben Coleman. I represent Appellant Armond, Sheriff Petrosian, who I think is number two on your list of three. Our plan was that I was going to take ten minutes to address the first issue in the joint brief, which is the question about whether there was an improper Allen charge after a juror wrote a note asking to be removed. I'm going to take ten minutes since that's a joint issue, and then my co-counsel, we're each going to take five minutes to address issues that are particular to their individual clients. Of course, we'll modify that if the court has a different desire. With respect to what I'll call the Williams issue, it's our position that when the juror sent the note saying that she couldn't agree with all the other jurors and that she wanted to get off the jury so that perhaps a replacement juror would agree with everybody else, that the district court erred under Williams when it then gave an Allen charge. It's a very similar circumstance to Williams. The government, I think, essentially has two points that they think distinguish this case from Williams, and the first is they claim the standard of review is different. Their contention is that the issue wasn't adequately preserved below. We have several responses to that. The first is that when the district court announced what it was going to do, counsel for Mr. Darbinian objected. He said, I object to an Allen charge at this point. It's our position that that objection was good enough. The district court evidently didn't think it was giving an Allen charge, disagreed with the objection, and there was no requirement to take an exception to the district court's determination. He didn't say, did he say, I object to an Allen charge because the objecting juror or the dissenting juror has been identified? No, he didn't say that. What had happened is the judge said, what I'm going to do is I'm going to reread the instruction that I gave at the end of the case, which is the exact same instruction that was given in Williams. Then counsel said, I object to an Allen charge at this point. Then the judge said, that's not what I'm doing. I'm not giving an Allen charge. Then defense counsel said, well, I thought that is what you're doing. And then the judge said, no, I'm going to reread this instruction, and that's what happened. So he didn't say anything about the juror revealing his or her identity, but he did object to an Allen charge. And then he specifically said, when the judge said, that's not what I'm doing, he said, well, I thought that's what you're doing, which is really what Williams says, is that is what you're doing, you're giving an Allen charge. So I think the record is sufficiently preserved at this point under the federal rules of criminal procedure and this court's case law. There was nothing further that needed to be done to preserve the issue. Can I ask about the Williams? Is it your position that Williams creates effectively a per se rule that if the juror identifies him or herself as a holdout, then the court has no point, has nothing to do but to declare a mistrial? Yes. I understood that correctly. I think there's actually a footnote. It's one of the last footnotes in Williams, and we've cited it in the brief, and I have Williams here. I could read it to you, but that's what this court specifically said. This court said, we commend the judge and the judge's efforts to do whatever it could to salvage a verdict after a long trial, but there was nothing the judge could do at that point other than declare a mistrial. And that's our position. That's what Williams said. Once the juror identifies him or herself. As a holdout, yes. Now, I guess that leads to the second point, the second point of distinction that the government is contending, which is that the signature of the juror was sloppy and the judge couldn't quite make out what the signature was. It's our position that that really doesn't matter what Williams and the case that Williams relied on, what they say is, well, how would the juror interpret the charge? And in this case, the juror has signed the note saying, I want off the jury. The juror obviously wants to identify him or herself to the judge because the juror wants to get off the jury. And at that point, the juror would think that they've. How did the juror identify herself? She signed the note. All right. Now, she happened to have a very. Not clear what the signature says. It's not by juror number. It's not by name, right? Well, it's the juror's name, but it's hard to read. It's hard to read. Isn't the first name Jan? It looks like it's Jan. But it's not a very good signature. I'll concede that. It's hard to read. My signature isn't very good either. So our cases seem to say if the juror, even if the juror isn't identified by name, if the juror thinks that the Allen charge is directed against the juror as a holdout, that's the concern that we have of coerciveness by an Allen charge. So does it matter whether the judge could read the juror's signature from that perspective? No, it doesn't. And that's precisely what I was trying to say, but probably not very well, which is the focus is on what the juror would think. And at that point, the juror thinks that the Allen charge is leveled at him or her because they've signed the note. They've said I can't convince everybody else I need to get off the jury. So when the Allen charge comes in, the juror is thinking that the judge is telling that particular juror, consider changing your mind. It's important that we reach a unanimous verdict here. And that's what we have right here. So it's our position that a new trial is required as to all defendants on all counts. And if the Court had no more questions, I'll reserve my remaining time for rebuttal. Thank you. Good morning. Vernal, we followed on behalf of Merida Binion. If the Court has any questions about the second jury coercion issue, I would be happy to answer them. If the Court does not have any questions about that particular issue, I would move into the sentencing and restitution issue for Mr. Darbinion. I think it's important to clarify what I am not arguing. I am not arguing that Mr. Darbinion cannot be assessed guideline points or restitution based upon the loss that was proved at the trial. I think it was about $278,000 that was proved for the bank and credit card fraud and about $4,800 for the 99-cent stores. That was proved, victims testified, and we have no objection to that. That clearly was proved by the government. But in order to get the guidelines really high, up over a million dollars, the government relied on two things. Exhibit one, which was not presented to the jury, was totally incomprehensible printouts. Are you talking about the spreadsheets from the banks? Right. Well, there was a spreadsheet prepared by the government based upon these printouts. There was a summary spreadsheet, and there was the backup, some of which was very tiny. But the government says those were available in electronic format. That was their argument. Is that incorrect? That is their argument. But the problem with that is that there was no witness who testified from the bank or the financial institutions or from the 99-cent stores who could verify anything about what these things meant, who could say that, you know, this is the loss to my institution, which is the normal way to go. And in terms of the 99-cent store, first of all, you know, it doesn't even matter whether it was in electronic form. You can't understand it. The way to interpret it is totally arbitrary. So you did make the point in your brief that it was illegible. When I went and looked at it in the record, some of them I could read and some of them were too small for me to read. But the government argues, well, you could see them online and you could read them that way. So are you abandoning the illegibility point? No, I am not. Okay, so could you just address that? If it's available online, does that make them legible? No, it does not, because it's not even just that it's illegible. A lot of it was also redacted. But the point is, is how do you interpret it? Okay, well, there's a difference between legibility and interpretation, so I just want to make sure I understand what your argument is. I'm still saying that it is illegible. And I, you know, got some of the discovery from the trial lawyer, and I looked at it and I still couldn't understand it and I still couldn't interpret it. It was very, very difficult to understand. So I have an argument, yes, it is illegible. It is unreliable. I missed the illegibility answer. Judge Agutta asked whether it was legible, the government claims it was legible on the screen. And asked, do you still maintain it's illegible if it's legible on the screen? And I just didn't hear what your answer to that was. Yes, it was. I did look at it on a disc that I got from the trial lawyer, and I still couldn't. It is illegible. But the judge who is required, you know, to rule on these objections, the judge didn't have it. So you're saying it's still illegible on the screen. It was still illegible to me when I tried to look at it. But what I'm also saying is that the judge who has to rule on the objections, the judge did not look at the legible, allegedly legible. I mean, you tell me this, I don't know. Judges nowadays have screens and things, district judges. There's a screen with a transcript going on, there are other screens. It's not for lack of electronic equipment, so I don't know what happened in the courtroom. Why do you tell me that the judge didn't see it on the screen? Because, first of all, that particular exhibit was not presented to the jury at the time of the trial, and during the sentencing hearing it was not presented, you know, blown up on a screen so that you could look at the legibility. So sentencing normally isn't just if there's an issue of reliability, which the district court found. I mean, there is no requirement for victims to testify for sentencing. The judge did not actually make a finding that these documents were reliable. Is the district court required to make an express finding? I mean, I see the victim impact statements that come in for restitution for loss amounts, and they're usually presented by the government, and it's the victim's statement about what the effect of the crime was on them. And I don't recall there normally is any finding or testimony at all regarding those. I think that's a very good point, but because the issue here was the government did not present any victim impact statements. The government did not present, either through trial testimony or at the sentencing hearing, any affidavit or any declaration from any bank official, from anybody at the 99-Cent Stores, or for anybody from any other... I believe it is because we still have to... Is there something in the sentencing guidelines or our cases that would help me understand that? Well, it is true that, for example, the rules of evidence do not apply in sentencing proceedings, but this court has held time and time again that the evidence that is presented must nevertheless have some indicia of reliability, and it is our position that none of these printouts had... They're totally meaningless. And I've just been talking about the 99-Cent Store, for example. We don't know what year these printouts came from. There was testimony, well, it was the 2004 date was manually entered. That does not mean that it was necessarily there for 2009. We have all these, like, swipes that happen, that look like, you know, it's coming, you know, second after second after second at midnight when the store's not even open. The officer who testified said, I don't know if they're debit cards, I don't know if they're credit cards. He could not tell whether they were valid. He couldn't tell what any loss is. And the defense attorney in this case made numerous efforts to subpoena the 99-Cent Stores, to do the government's work for them and bring in and say, what did you lose? The 99-Cent Store refused to comply, and the government did not want any more continuances. If the government really believed and thought it could prove that there were losses and intended losses way over a million dollars, why couldn't the government bring in any of these witnesses or present some affidavits? I could not find a single case in which these vague, incomprehensible, illegible, and unreliable printouts are used to provide the loss over a million dollars. And that's our position, that the sentence should be vacated and remanded. And let's start at square one. Are there any questions? I will then save the rest of my time for rebuttal. Thank you. Good morning. Katherine Kimball-Windsor on behalf of Rafael Parcedanian, who was not charged in the racketeering counts or in the extortion counts. The government charged Mr. Parcedanian with a very simple bank fraud access device fraud case. The main issue that I wanted to discuss today was the manner in which this simple fraud case against Mr. Parcedanian was charged and tried as part of this massive racketeering prosecution against Armenian power, which included evidence of gangs, guns, kidnapping, extortion, a Mexican mafia witness who testified about having committed murder. And my argument is that the joinder of Mr. Parcedanian's case to the Armenian power case, coupled with the introduction of inadmissible prejudicial evidence and the way in which that came in, the way that the limiting instructions happened or often didn't happen, deprived him of a fair trial. From the very beginning, Mr. Parcedanian was linked subtly, sometimes inexplicably, with Armenian power. The case agent, for example, would emphasize, oh, Mr. Parcedanian isn't charged with the racketeering counts. And there were those sort of subtle distinctions made. But then the government repeatedly introduced unnoticed prejudicial other acts, which even in the brief they don't call other acts, but which were evidence of other crimes that Mr. Parcedanian had allegedly committed. And the way they came in is that the judge would say, on one occasion in any event, would say, I don't know where you're going with this, but, okay, let's bring it in. Oh, okay, well, so this sounds prejudicial. And then later on would let the evidence stay in and then later on strike it. So most of the evidence you complain about the district court did order that it be struck, and I think did he give a curative instruction to the jury regarding that? Yes. So the evidence of the kidnapping and extortion that Mr. Parcedanian had supposedly participated in, he struck the evidence. In one case, it was a week later, and he said, anything you've heard about extortion related to Mr. Parcedanian you are not to consider. That instruction, that was the instruction, was you're not allowed to consider it against him anymore. That was after they'd been told that they could consider it as to his knowledge of the counts that he was charged with. And at that point, the jury didn't even have a definition of extortion. So it's unclear what they would have understood was being stricken. But that evidence stayed in for a week. The other, what I think the most prejudicial evidence was in the colloquy where the prosecutor brought in that M.M. was being held, Minus Matossian was being held in a cell phone store. And then there was an objection. Oh, a cell phone store owned by Raffo, who the jury knew was Mr. Parcedanian. And then the judge sustained the objection and said, don't consider that. And so then the prosecutor came back and said, okay, so you were held in a store, but don't tell me the type of store that you were being held in. I mean, it was repeatedly emphasized. So if we assume that the jury followed the instructions, which we generally do, not always, was the evidence that was not struck, was that enough, in your view, to be prejudicial? Yes. The evidence that remained in custody had to do with this shooting that had occurred at a restaurant in Glendale and that Mr. Parcedanian had been sent to clean it up and to erase evidence, to destroy the evidence. But that was the one piece of evidence that remained, if we assume the jury followed the instructions. Is that right? Yes. So that remained. And that was just supposed to go toward his knowledge of the scheme. And that's really the problem, is that if you're going to try a case like that, you're going to try the little guy with the big, scary racketeering case. And there really have to be clear instructions, clear, with each witness, about whether this is allowed to be considered against him. If there is evidence, you really have to explain to the jury, okay, you can't consider this as to Mr. Parcedanian's character. This only is going to his knowledge. And, you know, I didn't understand when I wrote the opening brief even what the government's theory was, that it was just sort of knowledge that Darbinian was a bad guy. It wasn't that sort of specific 404B knowledge that we think of about whether it's, you know, knowledge of the knowledge required for the bank fraud. And so I really would, though, like to say that even the evidence that was stricken was just so prejudicial and coupled with sort of the just constant innuendo that Mr. Parcedanian really was involved with more than he had been charged with. That his case should be reversed on the grounds of even what the judge struck from the record. Are you basing your request for reversal on the improper admission of evidence or the failure to sever? Well, both. We also filed a severance motion in this case. And I'd like to also just emphasize that because these cases are charged so often in the central district, these huge racketeering cases where the little guys are frequently brought in, and, you know, severance here would not have been, this would have been a short trial. It would have been easy to sever. Mr. Parcedanian didn't need to be at this trial where there was all this really frightening evidence of gangs and guns. And so we raised both of those issues, the severance and the admission of prejudicial evidence. Thank you. Thank you. We'll hear from the Governor. Good morning. May it please the Court. Elizabeth Yang on behalf of the United States. I'd first like to address the joint issue that all of the defendants have raised in terms of the Williams issue. When appellate counsel came up here, there was constant references to the holdout juror as she. I think that's one of the questions in this case and one of the issues. We don't know anything about the holdout juror. Based on the note itself, there are no pronouns used. We don't know if it's male or female. As Judge Kaczynski noted, there was no juror number. And all we have is a signature, which we can speculate the first name is Jan. But there's no evidence that we know who this individual is. But apparently from our cases, the evil that we're concerned about is not whether the court knows who the holdout jury is, but whether the holdout juror thinks that the court is directing the al in charge, continue deliberating, change your mind if you think you should, to that individual. So that individual feels that they are being singled out with that charge. So I'm not sure it matters whether the district court could read the juror's name or not. Why would it matter given that that's the evil, the coercive evil that our cases are trying to address? Well, in the cases where the court does raise a concern about the coercive evil that is imposed on a holdout juror, the cases are very careful to note that the important factors are, one, that the judge knew the holdout juror's identity. Two, the holdout juror knew that the judge knew his or her identity. And three, that holdout juror was a holdout for acquittal. I don't think you have any of those factors in this case. I think what you have, this is not a case where the district court's instructions work to blast a verdict out of a deadlock jury. I think if you look at the totality of the circumstances and the chronology of deliberations, what you see is a jury that had not deliberated for a significantly long period of time in comparison to the length of trial. But this juror, I'm sorry to interrupt you, but this juror was asking for more than just a hung jury. This juror wanted out. He said, excuse me, because I can't go along with the rest of the jury. And in response to that, the judge says, after giving the pattern instruction, he continues and said, so the easy answer, and the answer means the answer to this juror's question, the easy answer is no, you can't get excused. That's obviously directed to that person who wrote the note. And then he goes on to say, the jury is a jury, and we can't excuse one of the jurors. You have to come to a decision as to the 12 of you unanimously. And then he goes on to say, and if you can't, you can't. But that juror obviously takes that instruction to be directed specifically to him or her. It doesn't really matter because Jan could be a guy. But that juror is taking that instruction as saying, you've got to keep going and reach a verdict. Isn't that right? And isn't that what Williams is all about? That is what Williams is all about. But again, what I think is a critical fact that is missing in this case is we don't know if that juror was a holdout for acquittal or conviction. Who cares? We don't know what the majority was. I think the concerns raised by Williams in Seychell and that progeny is that the coercive effect of the court's instruction on that jury compels that juror to give up their consciously held belief in the not guilty of the defendant and go with the majority for the guilty. Here, we just don't have any sense of where the majority stood and where the holdout juror stood. And importantly, Your Honor, after the district court gave the duty to deliberate instruction, which I understand Williams considers an alan charge in these circumstances, the jury did not come back with verdicts. They asked for the playback and readback of additional testimony. They took a lunch break. They took an overnight break. They deliberated more, and they came back. That cuts both ways, doesn't it? I apologize? That cuts both ways. That means that that person felt compelled to stay there and reach a unanimous verdict, doesn't it? We don't know what unanimous verdict it was, though, Your Honor. So you're distinguishing the cases based on our ‑‑ I guess we have a handful of them in the alan charge situation, and you're distinguishing them on the basis that the judge knew how many for acquittal and how many for conviction. Can you point me to what I should look at for that distinction? Well, I think if the court ‑‑ in the Williams case, the fact that the court knew, clearly knew the juror's identity, she identified herself by name and number, had said she was, you know, she couldn't be bombarded by the other jurors to change her mind, she couldn't face the defendants with convictions. And did anything turn on? One, in Williams, did the court know that the holdout was for acquittal? And, two, did we say anything turned on that? It was not a specific finding that it turned on that one fact about conviction or acquittal. It was the combination of factors. Okay. So where do I look to find that as a basis for a distinction? Well, in Williams, there's language along the lines that there was no doubt that the court knew the identity of the holdout juror, that the holdout was for acquittal, and that the juror knew the district court knew her identity. And I'm paraphrasing, Your Honor, but I have a pin site of 547F3rd at 1207, including note 17. So footnote 17 doesn't say anything about acquittal. It says, here there's no doubt about the identity of the holdout juror, that the juror knew the district court knew her identity because the juror sent a note directly to the district judge. I mean, it seems very similar. It's hard for me to ‑‑ I think it would be hard to explain why it makes a difference that the juror who identified herself to the court and it would make a difference if the court actually couldn't read the handwriting. I'm not sure why that would make a difference. I do. I understand, Your Honor. I understand the concerns raised by these courts. It's the coercive ‑‑ or the belief that the holdout juror has that the judge's instructions are directed at him or her. But what my argument is that there are other circumstances that those courts raise in which that concern is paramount because the judge is aware that the holdout, for example, is for acquittal as opposed to conviction. And here we just don't have those types of coercive circumstances. I mean, you can certainly infer from the fact that she said, they're all against me and I'm the only one who disagrees, or words to that effect, and then after a delay they all vote guilty. I mean, you certainly can infer that she was a holdout for acquittal. That seems to be the most reasonable inference that can be raised. And I just don't remember in the other cases I looked at that there was any specific discussion that we know that she wants to acquit. But if it were otherwise, if there was one holdout who thought that the defendant was guilty, we might have reached a different result. I just don't remember anything like that. The decisions do not turn on that specific fact. They would turn on the combination of facts. Yeah. And I do think in this case, Your Honor, it's important to note we did have a split verdict as to one of the defendants. So while there is an inference that could be made that the holdout was for conviction ‑‑ I mean, acquittal, I apologize. There's also an equally plausible inference that the holdout was for conviction. So it's unclear, based on this record, if we have the same circumstances that raised the court's concern in Williams that would require a reversal of all the convictions. But if nothing turns on acquittal or conviction and you say there's nothing specific in the cases and I don't recall anything either, then it really doesn't matter, right? The issue is if the juror is being coerced or feels a coercive effect of the deliberation instruction. I'm sorry, Your Honor. There's also the fact that there were two other instructions here that was arguably coercive, right? The instructions in response to jury notes five and six, that's correct, Your Honor. So this seems to violate the rule that once you know there's a holdout juror, you're not supposed to give multiple out on charges. Well, a couple of points to that, Your Honor. One is, I think just a brief sort of recitation of the chronology of deliberations. The jury goes out to begin deliberating the end of the day on, I believe it was April 15th. Or April 14th, I apologize. The next day, which is again towards the end of the day, jury note five comes out. That's the first note that comes out where the jury indicates they're unanimous on some verdicts but they are not unanimous on other verdicts and asks for guidance on how to fill out the verdict form. At the defendant's request, the district court instructs the jury to continue deliberating. The district court had offered the parties the option of taking a partial verdict or instructing the jury to continue deliberating because they had only deliberated for a day, which in the district court's very correct judgment was not very long, given the fact that it had been a three-week trial. The court then very briefly instructs the jury to continue deliberating, see if they can reach verdicts on all the counts. The very next morning, only approximately 30 minutes after the jury starts resuming deliberations, note six comes out, and in substance it's similar to note five. And in that case, the judge does what the court did in the Cuozzo case. It inquires of the jury where they stand, like, you know, is any progress being made? Importantly, when the court learns the jury has reached verdicts on all counts as to some defendants and is only deliberating over a small number of remaining counts, the court instructs the jury to continue deliberations, does not exhort the jury and tell them they have a duty to reach unanimous verdicts, does not order the jury to reach unanimous verdicts, but rather encourages the jury to do so if they can do so. And during this exchange, the foreperson does not indicate to the court that further deliberations would not be useful. The only true, quote, unquote, Allen charge or what can be construed as an Allen charge I submit came in response to note number seven, which is the holdout juror note. And that is an Allen charge under this court's decision in Williams. But if you look at that note in context, Your Honors, the jury that had only deliberated for approximately a day, that the court, in its very correct experience judgment, thought deliberations could continue to be useful and you don't have a foreperson saying no, we're completely deadlocked, deliberations would be useless. I think the court's instructions, including model jury instruction 7.1, were perfectly appropriate and do not plainly indicate coercion under these circumstances. And importantly, Your Honor, when the court... Just to make sure I understand. So how many Allen charges do you think there were? I think arguably there was just one. The one in response to... In response to the holdout juror note, yes, Your Honor. Under Williams, that would be considered an Allen charge. Although respectfully, given the fact that it was this court's model 7.1 instruction, it did not actually have the hallmarks of an Allen charge. Isn't it similar to what was given in Williams? It is, which is pretty much the same thing. So I'm saying that under Williams, it would be considered an Allen charge, even though the language of itself does not have the hallmarks of an Allen charge. So I don't think, Your Honor, for certain that there's any Seawolf error. There are not multiple Allen charges. At most, there is one. And I think under the totality of circumstances the court must look at, in terms of the nature of the instructions, the time of deliberations, the fact that the jury asked for additional evidence and then did not return with a verdict but took additional time to deliberate. All of these together do not raise the inference of coercion and the verdicts should not be disturbed. Unless the Court has any further questions on the jury issue, I will move on to address some of Appellate Counsel's other arguments. With regard to Defendant Darbinian's sentencing and restitution argument, I just wanted to clarify a couple of things. One, the loss amount that the district court calculated was not based on the bank spreadsheets that were provided to the court. The loss amount, well, let me turn it back. The number of the access cards was, wasn't it? The predominant calculation was based on the number of access device cards. And was that from the bank's spreadsheet? It was not, Your Honor. What it was from four point-of-sale terminals that law enforcement were able to recover from 99-cents-only stores after seeing video of the schemers swapping them out. Those records were downloaded, duplicates were eliminated, and a total of 1,983 unique access device numbers were obtained. Now, as the Court is well aware under its case law, in fraud cases the Court only needs to make a reasonable estimate of loss. So if you take those access device fraud numbers, you multiply it by the $500 figure, you're at approximately $991,000. Given the fact that there was testimony and evidence that point-of-sale terminals were seen swapped out at multiple other 99-cent stores but were never recovered by law enforcement, and that five additional terminals were recovered, but they had Bluetooth schemers, which allowed the downloading of the access device numbers, so there was nothing on the schemer or the point-of-sale terminal, it would be perfectly reasonable for the District Court to infer that a minimum of 18 additional access device numbers were retrieved from those 11 other access devices, which would give the Court a very reasonable basis to estimate that loss is over $1 million. With regard to the bank spreadsheets, those were submitted in support of the restitution claim, and I understand counsel's eligibility argument, but two things to note. One, the District Court never indicated that it could not read the records, that they were illegible, that they were accordingly unreliable for the Court to rely on. And secondly, Your Honor, it's not in the record, but I did go on PACER prior to oral argument, and the records are available online, and as I'm sure Your Honors have access to, so does the District Court. But again, there's nothing in the record that would indicate how the District Court observed those records. All we have is there's no indication that they found them to be illegible. They also, opposing counsel also argues that there was no affidavit or anything indicating what the records purported to be and what the basis for them was. That is actually not accurate, Your Honor. Agent Stebbins, who is the case agent, did testify, and he did explain how he prepared, Your Honor, and referenced Exhibit 1, which was a summary chart of those lost amounts, and he did explain that he had based that summary chart on the bank's spreadsheets that had been provided to him as well as subsequent information the bank had provided to him to correct some of the calculations. The spreadsheets themselves are very self-explanatory. They are not completely devoid of logic. What is redacted in those spreadsheets is the identifying information for the victims. Obviously, we have individuals who had been victimized once. We do not want to publicly disclose more identifying information so they could be victimized again. But those spreadsheets were within the time frame of the charge $0.99 only store scheme and did indicate customers' loss amounts and in some occasions what $0.99 stores those customers had actually shopped at prior to their information being stolen. Go ahead. Speaking of Mr. Stebbins, I know we didn't have all the time to talk about all the issues in the briefs in this case, but the defendants have made major arguments about Mr. Stebbins' testimony as both a lay witness and an expert witness. Can you just address that issue from your point of view very briefly? Of course, Your Honor. As the government did note in its brief, the government agrees that under Freeman and Vera, the district court did err in not instructing the jury on the dual role of Agent Stebbins. But we do believe that under Freeman, the other methods were undertaken throughout the course of trial that delineated for the jury the differences between the testimony. And importantly, Your Honors, I think looking at the record as a whole, what you see is the foundation for Agent Stebbins' testimony was laid. And the district court did conduct its gatekeeping function in terms of questioning Agent Stebbins when it did not understand the foundation for his testimony, sustaining objections when it found that the foundation was lacking, policing the limits of Agent Stebbins' expertise, and just ensuring that the jury had all the information it needed in order to assess Agent Stebbins' opinion. But isn't that all the more reason for the final instructions to include the dual role? Your Honor, that is true. And as the record indicates, the district court intended to and inadvertently omitted the instruction. And the parties, the defendants, did not raise that omission with the court, either at the close of the final charge or at the post. After the jury was retired to deliberate, the parties stayed afterwards to deal with scheduling issues, and they did not raise it then. So you think it was waived? I do think it's a plain error analysis, Your Honor. And I think this is where we come back to the purpose of plain error. And the purpose, obviously, as this Court is aware, is so the district court can correct or avoid a mistake that could ultimately affect the outcome of the case. And had this omission been raised with the court, given the fact the court had clearly indicated it intended to give a dual role instruction, this issue could have been avoided. I do think in terms of the actual substance of Agent Stebbins' testimony, I think it is clear that he gave completely proper lay opinion testimony. I think under Gadsden, as well as the Eleventh Circuit case in Jayussi, he was a percipient witness and he had adequate foundation to testify. And in terms of his expert testimony, there's no challenge to his expertise. And the limited expert testimony he gave to the district court, There was a motion in Limine, though, was there not? There was a motion in Limine, not in terms of challenging his expertise, but in terms of challenging his ability to interpret calls, whether as a lay witness or as an expert witness. Because he didn't understand Armenian and Russian-Armenian? Yes, Your Honor, the argument was that he was not fluent in Armenian, but I think as the case law makes very clear, that is not the relevant inquiry, given the fact that the English translations of those foreign language calls were the evidence, and he did testify from those, with regard to the Armenian calls, with regard to the English calls, obviously the English recordings are evidence, but he, again, interpreted the English words. And you don't think that was enough to preserve their objection to his ability to make those interpretations? Regardless of whether you call it expert testimony or lay testimony? Your Honor, I think that, well, maybe I misspoke. In terms of their – I think they did not – that's not sufficient to preserve the issue of the dual role instruction. I think in terms of the challenge to the testimony, that does come under abusive discretion, so I apologize if I missed that. No, that's fine. And it looks like I am out of time, so unless the Court has any further questions? Thank you. I would submit. Thank you. I think you're out of rebuttal time, but we'll give you each a minute if you wish to take it. On the Williams issue, I think for the first time the government has argued that a distinction is that we didn't know which way the jury was going technically here, whether the holdout was for acquittal or for conviction. They didn't raise that in their brief, but none of the cases say that that is a determinative factor. I mean, certainly the government has just as much of an interest in not having a holdout juror coerced into acquittal as a defendant has in having a holdout juror coerced into a conviction. In addition, I think sort of the seminal case in this entire area is the Supreme Court's decision in Brasfield, which is from back in like the 1930s, which was the case where the Supreme Court made a prophylactic rule that a judge is not allowed to inquire of the jury as to how they're divided numerically. But there's no difference whether they're inquiring as to guilt or they're inquiring as to acquittal. The system is designed so that a juror is not coerced into holding out. And so I don't think that that distinction that they've raised for the first time today gets them around Williams at all. Thank you. I'll give you a minute each. I would like to respond to the issue regarding Agent Stebbins. Under the Reyes-Vea case that this court came down, this court reversed on this dual role, failure to instruct on the dual role without a request at all. So I think that that's important, and I think it's important to remember that Agent Stebbins' testimony and his interpretation of these calls, most of which were overwhelming. I think there were only a few of them in English, constituted one-third of the entire government's case. And so, therefore, the failure to instruct on the dual role should require a reversal. And if there are no other questions, I'm done. Thank you. I just briefly wanted to say that the government agrees that Mr. Parsadanyan's case should be remanded for resentencing for consideration of minor role, and also just to say that we joined in the issue on the amount of loss and that it does have some profound implications for Mr. Parsadanyan's immigration case. Would that be a full resentencing then? You'd basically start over again? For the role, yes. In my circuit, it would be. Yes, I believe so. I don't know about this circuit. Okay, thank you. Thank you. Okay, thank you. The case is argued in the sense that we are adjourned. All rise.
judges: Kozinski, Ikuta, Gettleman